UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at KNOXVILLE

| ALMEER K. NANCE, | ) | |
|---|---|---|
| | ) | |
| *Petitioner*, | ) | |
| | ) | |
| v. | ) | No. 3:09-cv-378 |
| | ) | *Phillips* |
| | ) | |
| STEPHEN DOTSON, Warden | ) | |
| | ) | |
| *Respondent*. | ) | |

## **MEMORANDUM**

This is a petition for the writ of habeas corpus pursuant to 28 U.S.C. § 2254 filed by petitioner Almeer K. Nance ("petitioner"). The matter is before the court on the respondent's answer to the petition, petitioner's amended petition, and the response thereto. For the following reasons, the petition for the writ of habeas corpus will be **DENIED** and this action will be **DISMISSED WITH PREJUDICE**.

I.  Standard of Review

A state prisoner is entitled to habeas corpus relief "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254. Under Rule 8 of the Rules Governing Section 2254 Cases In The United States District Courts, the court is to determine, after a review of the answer and the records of the

case, whether an evidentiary hearing is required. If no hearing is required, the district judge is to dispose of the case as justice dictates. If the record shows conclusively that petitioner is not entitled to relief under § 2254, there is no need for an evidentiary hearing and the petition should be denied. *Baker v. United States*, 781 F.2d 85, 92 (6th Cir. 1986).

II.     Factual Background

The respondent previously filed a motion to dismiss, which was granted in part and denied in part. In support of the motion to dismiss, the respondent provided the court with copies of the pleadings and court opinions on direct appeal and in post-conviction proceedings. [Court File No. 7, Motion to Dismiss, Addenda 1-3 (including subparts)]. After the ruling on the motion to dismiss, the respondent provided the court with copies of the Technical Record, Transcript, and Exhibits from petitioner's criminal trial proceedings. [Court File No. 15, Notice of Filing, Addendum 4 (consisting of eight volumes)].

Following the transfer of his case from juvenile court, petitioner was convicted in the Circuit Court for Knox County, Tennessee, of one count of felony murder, one count of especially aggravated robbery, two counts of especially aggravated kidnaping, and three counts of aggravated robbery; he received an effective sentence of life plus 25 years in prison. On direct appeal, petitioner challenged only the trial court's refusal to grant his motion to suppress the statement he gave to authorities. [Addendum 1, Document 5, Brief of Appellant, p. 6]. The Tennessee Court of Criminal Appeals affirmed the trial court's denial of the motion to suppress. *State v. Nance*, E2000-00170-CCA-R3-CD, 2001 WL

2

1268499 (Tenn. Crim. App. Oct. 23, 2001) [Addendum 1, Document 3], *perm. app. denied, id.* (Tenn. March 11, 2002) [Addendum 1, Document 1].

Petitioner next filed a petition for post-conviction relief in which he alleged ineffective assistance of counsel. The trial court dismissed the petition for failure to prosecute and the Tennessee Court of Criminal Appeals reversed. *Nance v. State*, No. E2005-022650CCR-R3-PC, 2006 WL 1575110 (June 9, 2006) [Addendum 2, Document 1].

On remand and after an evidentiary hearing, the trial court denied the post-conviction petition, finding that petitioner was not denied the effective assistance of counsel. The Tennessee Court of Criminal Appeals affirmed the denial of post-conviction relief. *Nance v. State*, No. E2008-00857-CCA-R3-PC, 2009 WL 160919 (Jan. 23, 2009) [Addendum 3, Document 3], *perm. app. denied, id.* (April 27, 2009) [Addendum 3, Document 1].

In his original habeas corpus petition, filed *pro se*, petitioner alleged that the trial court erred in failing to suppress his statement. [Court File No. 1, Habeas Petition, p. 6]. He also alleged several instances of ineffective assistance of counsel. [*Id.*, attached Memorandum in Support of Habeas Petition, pp. 1-12]. The respondent moved to dismiss the habeas corpus petition based upon procedural default.

The court agreed that petitioner had procedurally defaulted the claims of ineffective assistance of counsel and granted the motion to dismiss as to those claims. The court found, however, that petitioner had not defaulted the claim that the trial court erred in failing to suppress his statement to the authorities. Accordingly, the court denied the motion to dismiss as to that claim and directed the respondent to respond on the merits to petitioner's claim that

3

his statement should have been suppressed. The respondent was also directed to expand the record to include the transcript of the hearing on the motion to suppress, exhibits introduced at the hearing, the trial court's written order denying the motion to suppress, and any other documents which are relevant to the issue. The respondent complied with the court's request, and in response to the habeas petition contends he is entitled to judgment as a matter of law based upon the findings of the Tennessee state courts.

Petitioner then retained counsel, who filed an amended petition in which he reiterated the argument that the trial court erred in failing to suppress petitioner's statements to the police. Respondent has filed a response to the amended petition.

III. <u>State Court Findings</u>

Pursuant to 28 U.S.C. § 2254(d), petitioner may not obtain federal habeas corpus relief with respect to a claim that was adjudicated on the merits in a state court proceeding unless the state court decision (1) was contrary to, or involved an unreasonable application of, clearly established federal law or (2) was not reasonably supported by the evidence presented to the state court. In addition, findings of fact by a state court are presumed correct and petitioner must rebut the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e).

The Supreme Court, in *Williams v. Taylor*, 529 U.S. 362 (2000), clarified the distinction between a decision "contrary to," and an "unreasonable application of," clearly established Supreme Court law under § 2254(d)(1). A state court decision is "contrary to"

4

Supreme Court precedent "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Id*. at 413. A state court decision "involves an unreasonable application of clearly established Federal law" only where "the state court's application of clearly established federal law was objectively unreasonable." *Id*. at 409. A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id*. at 411.

IV.  Discussion

On direct appeal, the Tennessee Court of Criminal Appeals summarized the evidence against petitioner and the circumstances of his confession as follows:

> As the defendant does not challenge the sufficiency of the convicting proof, we will only briefly address the evidence supporting the convictions. Essentially, on January 16, 1996, the defendant and Robert Manning robbed at gunpoint Scott's Market in Knoxville. Two days later Manning picked up the defendant at the defendant's home. Amanda Goode accompanied the pair. In looking for a place to rob, the three finally came to a Radio Shack. Goode stayed in the car while Manning and the defendant, wearing toboggans/ski masks, entered the store. Both men were once more armed with guns, and in the process of the robbery, the store clerk, Joseph Ridings, was shot in the head. He subsequently died from this wound. Upon leaving the store, Manning and the defendant rejoined Goode in a stolen Mazda, and the trio drove from the scene. They then discovered a raised garage door at the home belonging to Arthur and Patsy Sipf. Again, Manning and the defendant exited the car. Finding the door from the garage to the living area of the home unlocked, the two proceeded into the house. Once more the pair donned toboggans/ski

5

masks. They stole items from the home while holding both Sipfs on the floor at gunpoint. The offenders then forced the couple into the trunk of one of the Sipfs' cars. Having done so, Manning and the defendant left in an automobile belonging to the Sipfs. Goode continued in the Mazda. At this point we note that the defendant was apparently returned to his home. He was not convicted of any offenses committed after the encounter with the Sipfs.

Some days thereafter, the authorities captured Manning and Goode in Kentucky and therefrom gained information about the defendant's involvement in these crimes. The police arrested the defendant in the early morning hours of January 22, 1996, and subsequently obtained a signed waiver and confession from him.

Prior to trial defense counsel unsuccessfully attempted to have this statement suppressed. The trial court conducted a hearing on this motion with four witnesses providing testimony.

First Detective Clyde Cowan set out his account of what had happened at the defendant's home and at the Knox County Central Facility. According to Cowan he observed Sergeant Andy Young and Lieutenant Fred Ludwig speaking with the defendant's mother at the defendant's residence. Cowan also claimed to have talked with the defendant's mother, explaining to her why the police were there; however, he acknowledged that he had not asked her permission to speak with the defendant. Nevertheless, the defendant was transported to the Knox County Central Facility to be interviewed. Detective Dan Stewart joined Cowan in this endeavor and began by advising the defendant of the reason for the interview and of his constitutional rights. Cowan further stated that at that point the defendant had indicated that he wanted his attorney, and Stewart left to call the public defender's office. Upon his return, Stewart allegedly informed the defendant "that he wasn't able to make contact with that person or that agency, and it would be the next day." Both detectives then left the defendant alone, and Cowan testified that the plan at that point was to transport the defendant to "Juvenile." However, when Cowan went into the room to retrieve his coat, the defendant volunteered that he wished to talk. Cowan asked Stewart to return; the defendant was again advised of his rights; a rights waiver form was executed at 2:45 a.m.; the defendant talked about the events in question and a recorded statement concerning the offenses was subsequently taken. Additionally, Cowan affirmed that he had not promised, threatened, or coerced the defendant in order to gain the contested statement.

6

The defendant then called Dan Stewart. Early in his testimony Stewart acknowledged having incorrectly stated during the juvenile court hearing that the defendant had not requested an attorney. However, Stewart also explained that he had retracted this statement upon refreshing his memory at the previous hearing using his handwritten notes taken contemporaneously with the defendant's interview. He further recounted that following the defendant's request for an attorney he had called the public defender's office. The call was answered by a recording telling him to call during office hours. Stewart then "told [the defendant] what the phone call had resulted in" and later learned that the defendant had changed his mind and would talk without a lawyer. After this, Stewart returned to the room where the defendant was and took a statement from him. Stewart testified that the defendant had been advised of and had waived his rights as reflected in the waiver form; the officers had then talked with the defendant about the offenses; the defendant had subsequently given a recorded statement; and no promises, threats, or coercion had been employed to obtain the statement. In addition, this witness was quite clear that he had said nothing else to the defendant until being advised that the defendant wished to speak without counsel.

Providing further relevant information was Sergeant B.A. Young of the Knox County Sheriff's Department. According to this officer he was at the defendant's home when the arrest was made and talked with the defendant's mother. More specifically, Young testified that he had told Ms. Nance to calm down and had informed her that they were there "to talk to her son about a criminal offense and look around for weapons ... used in the criminal offense." She allegedly responded by "stat[ing] that she'd already told the officers that they could talk to her son and ... look around, just [don't] wreck her apartment or hurt her son." Briefly thereafter, Young transported the defendant to the Central Building but did not talk with him during this time. On cross-examination, Young admitted that he had neither advised the defendant of his rights nor had he told the defendant's mother where he was taking the defendant.

Finally, the defendant gave his account concerning the night of his arrest and the taking of his statement. He stated that no one had read him his rights at the time of the arrest but also no one had questioned him at the scene. However, he testified that the officers at the Central Building had informed him that he had to sign the waiver before he could be appointed an attorney. The defendant further claimed that in telling him that an attorney from the public defender's office could not be reached at that time, Stewart had added comments such as: "that's how much they care about you ... ain't nothing they

7

could do for [you] ... no need in [you] trying to go through all that, get no lawyer or nothing [sic] ... just tell [me] and [I] can tell [your] attorney...." Additionally, the defendant alleged that he had asked for an attorney numerous times that night before finally talking with the detectives. Turning to cross-examination, the defendant admitted that he had been arrested on two prior occasions; had been read his rights on at least one of these; and had previously been represented by an attorney from the public defender's office. Nevertheless, the defendant alleged that he had thought the tape recording of his statement had been for his future attorney to expedite the resolution of his case.

> After hearing this testimony and listening to arguments of counsel, the trial court rendered its decision through a written order denying the motion to suppress.
>
> The defendant was tried and convicted of the multiple offenses as aforementioned. He now contends that his convictions should be reversed and remanded for a new trial because the trial court committed error in admitting his statement.

*State v. Nance*, 2001 WL 1268499 at **1-3 (footnotes omitted).

In *Miranda v. Arizona*, 384 U.S. 436, 444 (1966), the Supreme Court set forth the procedures for applying the privilege against self-incrimination and the right to counsel in custodial interrogations. The Supreme Court noted that a defendant may waive his rights, provided the waiver is made voluntarily, knowingly and intelligently." *Id*. However, once a defendant invokes his right to remain silent and/or states that he wants an attorney present, the questioning must cease. *Id*. at 444-45.

Questioning may resume if the defendant himself initiates further conversation regarding the investigation.

> [W]e now hold that when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated

8

> custodial interrogation even if he has been advised of his rights. We further hold that an accused, such as [the defendant], having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.

*Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981). Nevertheless, "the burden remains upon the prosecution to show that subsequent events indicated a waiver of the Fifth Amendment right to have counsel present during the interrogation." *Oregon v. Bradshaw*, 462 U.S. 1039, 1044-45 (1983).

In considering petitioner's claim that his statement should have been suppressed, the Tennessee Court of Criminal Appeals first noted that *Edwards v. Arizona* established the standard under which the claim should be evaluated. *State v. Nance*, 2001 WL 1268499 at *4 (citations omitted). "The first question to be answered, therefore, is whether the defendant did, in fact, re-open the dialogue with the authorities." *Id*. The appellate court concluded that he did.

> In this respect the evidence supports the trial court's conclusion. For example, testimony exists that the defendant asked for the public defender. Stewart then called the office and received a recording. He informed the defendant of this fact and no further questions were asked of the defendant. Shortly thereafter, intending to retrieve his coat, Detective Cowan re-entered the room where the defendant was; and unprompted, the defendant indicated his desire to speak with the officers.

*Id*. The court then considered "whether the defendant's waiver of his rights was knowingly and voluntarily entered." *Id*. at *5 (citations omitted).

9

The court paid special attention to the fact that petitioner was a juvenile at the time of his statement:

> In *State v. Callahan*, 979 S.W.2d 577 (Tenn. 1998), the Tennessee Supreme Court held:
>
>> that juvenile waivers shall be analyzed under a totality-of-the-circumstances test that requires consideration of the following factors:
>>
>> (1)   ... all circumstances surrounding the interrogation including the juvenile's age, experience, education, and intelligence;
>>
>> (2)   the juvenile's capacity to understand the *Miranda* warnings and the consequences of the waiver;
>>
>> (3)   the juvenile's familiarity with *Miranda* warnings or the ability to read and write in the language used to give the warnings;
>>
>> (4)   any intoxication;
>>
>> (5)   any mental disease, disorder, or retardation; and
>>
>> (6)   the presence of a parent, guardian, or interested adult.
>
> *Id.* (quoting *Callahan*, 979 S.W. 2d at 583). The court also noted that "[t]he supreme court further provided that '[w]hile courts shall exercise special care in scrutinizing purported waivers by juvenile suspects, no single factor such as mental condition or education should by itself render a confession unconstitutional absent coercive police activity.'" *Id*. (quoting *Callahan*, 979 S.W. 2d at 583).

10

The Tennessee Court of Criminal Appeals then considered the record as a whole and concluded that petitioner's statement was properly admitted.

> Turning to the evidence in this case, we find that the defendant's statement was properly admitted. While factors surrounding the taking of the statement such as the extreme lateness of the hour and the mother's absence are of some concern, the evidence relative to the entire situation supports the trial court's denial of the motion to suppress the defendant's statement.
>
> As above-noted, we are to examine these claims in light of the totality-of-the-circumstances using the aforementioned criteria. Two days after the taking of the contested statement, the defendant turned seventeen-years-old. The defendant had previous experience with the court system, attorneys, and advice concerning his constitutional rights. According to a psychological evaluation made an exhibit to the record, the defendant possessed average intelligence. There seems to be no question about the defendant's ability to read the rights form because he acknowledged doing so. We further note Detective Cowan's testimony that Stewart read the rights to the defendant and allowed the defendant time to read each individual right and then initial on the line beside each right if the defendant understood it. The waiver form submitted as an exhibit bears the defendant's initials on the line next to each right. Again referring to the *Callahan* factors, we observe that there was no allegation of intoxication which would have interfered with the defendant's ability to comprehend and knowingly waive his constitutional rights. It appears that the defendant knowingly and voluntarily elected to talk to police.

*Id*. (footnotes omitted).

This court has reviewed the transcript of petitioner's suppression hearing [Addendum 4, vol. 3-4, Transcript of Suppression Hearing, pp. 1-116] and finds the decision by the Tennessee Court of Criminal Appeals is supported in the record. Detective Clyde Cowan testified that around midnight or later during the night of January 21-22, 1996, petitioner was taken into custody at his mother's residence. [*Id*., vol. 3, pp. 4-5]. Petitioner was transported by a patrol unit to Knox County Central Facility in order to be interviewed. [*Id*. at 6].

11

Detective Cowan met up with Detective Dan Stewart and together they orally advised petitioner of his rights and the reason he was taken into custody, which was the Radio Shack homicide. [*Id*. at 6-7]. After being advised of his rights, petitioner asked to speak with his attorney. [*Id*. at 7]. Detective Stewart left to contact the attorney and returned, stating that he could not contact the attorney until the next day. [*Id*. at 7-8]. The detectives left petitioner alone in the interview room, with the plan being to "[t]ransport him to Juvenile." [*Id*. at 8].

According to Detective Cowan, when he went back into the room to get his coat, petitioner said that he wanted to talk. [*Id*. at 9]. Detective Cowan retrieved Detective Stewart, they again advised petitioner of his rights, and they began the interview. [*Id*.]. Petitioner signed a written rights waiver and also initialed each listed right, at approximately 2:45 a.m. [*Id*. at 9-12]. Although the interview was not initially recorded, it was later on beginning at 3:35 a.m. and ending at 4:18 a.m, and was subsequently transcribed. [*Id*. at 13-15]. Detective Cowan denied threatening, coercing, or promising petitioner anything. [*Id*. at 15]. After the interview was concluded, petitioner was transported to juvenile detention. [*Id*. at 15-16].

On cross-examination, Detective Cowan testified that petitioner was found in his bedroom in his bed clothes sometime after 1:00 a.m. at his mother's home. [*Id*. at 17-18]. Detective Cowan admitted that, although he spoke with petitioner's mother, he did not get permission from her to speak with petitioner. [*Id*. at 18-19]. He also clarified that Detective Stewart was the one who personally advised petitioner of his rights, in Detective Cowan's

12

presence. [*Id*. at 23]. Detective Cowan also testified that petitioner was not originally given a rights waiver to sign because he had asked for his attorney; it was only after petitioner said he wanted to talk that he was given the written rights waiver to sign. [*Id*. at 24-27].

Detective Stewart was called as a witness by petitioner and questioned about the notes he made during the interview. The notes were dated January 22, 1996, and began approximately 2:36 a.m. [*Id*. at 34-35]. Detective Stewart was on call that evening and was called by Detective Cowan around 2 a.m. for assistance in interviewing a suspect in the Radio Shack homicide. [*Id*. at 37]. His notes were taken contemporaneously with the interview and as a way to refresh his memory. [*Id*. at 37-38].

Detective Stewart admitted that during a juvenile court proceeding, he testified that petitioner never asked for an attorney; after reviewing his notes, he retracted that statement. [*Id*. at 38]. According to Detective Stewart's notes, petitioner was given his rights at 2:36 a.m., petitioner waived his rights, and then asked for an attorney. [*Id*. at 39]. Detective Stewart then called the Public Defender's Office, heard the recording that the office was closed and to call back during business hours, and advised petitioner that his attorney was not available. [*Id*. at 39]. Detective Stewart could not remember the exact conversation but that at sometime afterward, petitioner said he would talk without a lawyer. [*Id*. at 39-40]. Detective Stewart was questioned extensively as to when petitioner was advised of his rights and when he signed the rights waiver. [*Id*. at 40-52]. The gist of Detective Stewart's testimony was that petitioner was advised of his rights; the detective began filling out the rights waiver but in the meantime petitioner asked for his attorney; the detective was unable

13

to contact the Public Defender's Office and so advised petitioner; petitioner said he would speak without an attorney; petitioner then signed the waiver of rights and the interview began. [*Id.*].

He reiterated that testimony on cross-examination. [*Id.* at 52-59]. Detective Stewart also explained that from the time petitioner signed the waiver at 2:45 a.m. until the tape recording began at 3:35, the detectives were obtaining information from petitioner about his and others' involvement in the Radio Shack homicide as well as other crimes petitioner had been involved in. [*Id.* at 59]. They then realized they need to make a tape recording of that information. [*Id.*].

Petitioner testified that when the detectives gave him the rights waiver to sign, he said he wanted an attorney and was told he had to sign the rights waiver in order to get an attorney. [*Id.* at 80-81]. Petitioner also insisted he signed the waiver before asking for an attorney and that he asked for an attorney a number of times. [*Id.* at 81-82]. On cross-examination, petitioner admitted that he had been arrested at least twice before, had been given his rights before, and had been represented by the Public Defenders Office. [*Id.* at 93-96].

By written order, the trial court denied the motion to suppress.

> The defendant has filed a Motion to Suppress a statement given by him on the ground of an alleged violation of his Sixth Amendment rights. The State and defendant agree that the case of *Edwards v. Arizona*, 531 U.S. 477, controls.
>
> The defendant was arrested at his home and transported for the purpose of interrogation. On being advised that he had the right to have an attorney

14

present he indicated he wished to have someone with the Public Defender's Office notified. At that point, all questioning stopped and one detective called the Public Defender's office and was advised (by recording) that the office would not be open until the following morning during business hours. The defendant was given this information and a short time later told an officer that he would "talk". At that point, a rights waiver was signed by the defendant after the Miranda rights were explained. Thereafter, the statement in question was taken.

> The factual situation thus parallels the exception in *Edwards v. Arizona, supra* as follows:
>
> "... unless the accused has himself initiated further communication, exchanges or conversations with the police".
>
> The Motion is DISMISSED.

[Addendum 4, Technical Record of Criminal Proceedings, vol. 1, p. 195, Order].

In his amended petition, petitioner makes much of Detective Stewart's testimony during the juvenile court hearing. [*Id.*, vol. 2, p. 158, Excerpt of Transcript of Evidence during Juvenile Court Proceedings, pp. 1-44]. Petitioner specifically refers to the fact that Detective Stewart first testified that petitioner never asked for an attorney but retracted that statement after reviewing his notes. [*Id.* at 18-19, 25-26]. Nevertheless, after reviewing his notes, Detective Stewart's testimony was consistent with his testimony during the suppression hearing in the trial court.

The findings of the state courts are supported in the record. In addition, they are neither contrary to, nor do they involve an unreasonable application of, federal law as established in *Edwards v. Arizona*. Petitioner is not entitled to habeas corpus relief.

15

V.  Conclusion

The petition for habeas corpus relief will be **DENIED** and this action will be **DISMISSED WITH PREJUDICE**. Petitioner having failed to make a substantial showing of the denial of a constitutional right, a certificate of appealability **SHALL NOT ISSUE**. 28 U.S.C. § 2253(c); Rule 22(b) of the Federal Rules of Appellate Procedure. The court **CERTIFIES** that any appeal from this action would not be taken in good faith and would be totally frivolous. *See* Rule 24 of the Federal Rules of Appellate Procedure. The court will further **DENY** petitioner leave to proceed *in forma pauperis* on appeal.

**AN APPROPRIATE ORDER WILL ENTER.**

s/ Thomas W. Phillips  
United States District Judge